FRANK GREGG, PLAINTIFF IN ERROR, v. CARLTON E. LOOMIS, DEFENDANT IN ERROR.

1.  **Commissions to Real Estate Agent:** ACTION: TRIAL. Where a real estate broker brought an action to recover commissions for a completed sale of real estate, and the testimony showed that he had merely procured a purchaser, who afterwards purchased such real estate from the owner, *Held*, That the action was one to recover upon a *quantum meruit*—the value of the services rendered, but as no objection had been made to the testimony, the judgment will be sustained.

2. ———: ———: JUDGMENT. Where an action was brought to recover commissions for effecting the sale of real estate, and the testimony shows that the broker merely procured a purchaser who purchased the premises from the owner, *Held,*. That a judgment awarding the broker a less sum than the commission upon a completed sale will not be set aside.

ERROR to the district court for Lancaster county. Tried below before POUND, J.

*Ryan Brothers,* for plaintiff in error.

*J. R. Webster* and *W. E. Stewart,* for defendant in error.

MAXWELL, CH. J.

This action was begun in the county court of Lancaster county, wherein, on March 20, 1886, judgment was rendered in favor of Loomis for $87.50 and costs of suit.

The cause was appealed by Gregg to the district court of Lancaster county.

For cause of action the plaintiff below alleges in his petition that he was, during all the transactions hereinafter set forth, a real estate broker engaged in selling real estate upon a commission. That about January 1st, 1886, defendant Gregg employed plaintiff Loomis to solicit and find a purchaser for lot 6 in block 125, Lincoln, at the sum of $2,500, and therefor promised to pay plaintiff a usual and reasonable fee and reward.

This plaintiff entered upon said employment and solicited one Smith to purchase said property, and exhibited said property to said Smith, and brought said Smith and said Gregg into negotiation, and such negotiation was finally, on or about the 1st day of March, A.D. 1886, consummated in the sale and conveyance of said premises to said Smith, whereby said Gregg became indebted to plaintiff Loomis in the sum of $87.50, the reasonable and usual rate of commission.

Payment has often been demanded and refused. Where-fore Loomis, the plaintiff, prays judgment against defendant Gregg for $87.50. The defendant in his answer admits he has paid nothing, and denies each and every allegation of said petition.

In November, 1886, the cause was tried in the district court of Lancaster county, a jury being waived, and the court thereupon found for defendant in error and rendered judgment against plaintiff in error for forty dollars and costs of suit. The plaintiff in error thereupon filed a motion for new trial, assigning as causes therefor :

1st. Error in the amount of the recovery, being too large a sum. 2d. That the decision is not sustained by sufficient evidence. 3d. That the decision is contrary to law. 4th. That the decision is erroneous in not be-ing in favor of defendants. 5th. That the decision is erro-neous in finding any sum due the plaintiff. The mo-tion was overruled, to which plaintiff in error duly excepted. Defendant in error also filed his motion for a new trial on the ground of error in the assessment of the recovery in that the amount recovered was too small, for that upon the evidence he was entitled to recover $87.50 and interest from the 9th day of March, 1886, and error of law duly excepted to at the time occurring at the trial of the cause. This motion was overruled, to which he duly excepted.

On the trial of the cause the plaintiff below testified : " My business is and was, during February and March, 1886, that of real estate, renting houses and selling real estate on commission. Gregg employed me in the first place. I sold Gregg lots five and six in the block 125, I believe for $2,300. I then told them the lots were worth $4,000, and that I would sell them for him at that price if he would let me do so. He said if I could get $4,500 I might sell them; he wanted that net. I said I did not sell lots that way ; if he would make me a price and stand

by it, I would sell the lots. So he made the price $4,600; he said he would stand by that price and not interfere with my customers. It ran along probably a month or six weeks; I showed them to different ones, and finally I got a party to take them. I went and informed him what the customer said, that he only wanted one, but I had an idea that I could get them to take them both. He said, sell them, stick them to it. I said that he had got to stick to it if they came to him; he said, I will not do it, I will have nothing to do with them. It worked and worked along till I saw Gregg again and finally told him who the men were, gave their names, the Smith boys. I met them again in a short time and I said, they want only one lot, will you divide? He said, yes, and we will make the corner lot $2,700, so the other will not be more than $2,500; I said that is too much, there is no use in talking about it. He said he would sell it in that way. I said, that is too much, I can get $2,500. He said he would sell it at $2,500, and I said, will you stand by that? he said, I won't have a word to say; you sell it, they will have to deal with you. He left me, and got fifteen feet about, and said, you had better hurry up, other parties are working with the Smith boys for that lot. I said it don't make any difference, you know he is my customer; I have worked it up, and it is mine. After that he left, and I saw the Smith boys again, but could not get an offer of over $2,500. I could not sell for $2,600; I would not let them go at all, but finally the thing hung fire and he thought he could sell, so he closed the sale, and it's over here; he sold at $2,500. I showed and introduced these buyers, Smith Brothers, to the lot; they drove by the lots twice in one day and noticed them. That day I seen them and impressed on their minds that they were the best lots they had seen, and asked them if they had seen these lots, and they said no."

On cross-examination he testified: "I was a witness in

this case on the trial in the county court; I rather think I was. On that trial I will swear I did not say that the only conversation I had with reference to this one lot was at the corner of O and Eleventh streets, when Mr. Gregg came along and I spoke to him about his price on one lot, whereupon he named $2,700, and I told him that was too high, that he then said it must net him $2,600; that then starting away, I said to him, I did not do business without a commission, and that was all that was said in relation to sale of one lot.

"On that trial I did not swear that I never had any conversation with either of the Smith boys about the sale of one lot, after the conversation I have spoken of, at the corner of O and 11th streets. I insisted all the time on the two lots all the time, till I asked Mr. Gregg if he would divide; then when he said he would divide, I went to the boys and talked one lot for $2,600."

F. E. Gregg testified: "I am the defendant; Mr. Beecher was the owner of lots five and six, block 125, and McMurtry came to our office to sell them, and Mr. Keyser and myself purchased them jointly some time in December, 1885. Shortly after we bought the lots Mr. Loomis came to us and said: Don't you want to sell those lots? Our reply was, that we had bought and our intention was to build on them. We didn't know whether we wanted to sell them or not. He said, I can, I believe, sell them for $4,500, possibly $4,600. I had never been in Loomis' office, and when he again came, I said: If you bring us (I believe it was $4,600 net) to us without expense, I don't think that I said we would make a warranty deed; any way, we would make a deed. He kept at it some time; finally I bought out Mr. Keyser's interest in the corner lot, and sold him my interest in the other; that passed to me the title of lot six, the corner one. Then my recollection of Mr. Loomis speaking about a single lot afterwards, was the time he spoke on the corner of Eleventh

and O streets; I never went to his office; he saw me on the street and called to me. He said: Will you sell that lot singly, referring to lot six on the corner. I said I did not know; my wife talked of building on it. He said: What will you take for it? I said, I don't know, I might take $2,700; that must be net to me. He said that was too high. I said, if you will bring me $2,600 without expense to me and without any commissions, I will make a deed to the property; that is all the conversation. It is possible he suggested what he said in his testimony before, that he could not take the property unless he got a specific commission; my reply was, I would pay no commissions. That made an end to the matter, and he turned and went into his office. I don't think I saw Loomis again about that single lot; I guess he did not take it very well because I said I would pay no commissions to anybody. Afterwards, I don't remember whether A. B. Smith came to me before or after the conversation; I had no conversation with no other than Smith; I think Smith came to me near the date, or shortly after we had transferred our interest, to see if I would sell the naked corner. He said: Will you sell the corner lot? I said, I don't know, what will you give? He said: What will you take? (Mr. Loomis' name was not mentioned.) I said I wanted $2,700. He said, I cannot pay any such price, it is too much. We talked back and forth a good while, and then parted. Afterwards, he again asked me what I would take; I said I would take $2,600. Smith was away some time; finally he saw me again and again asked me. I told him $2,600; no, I said, I would not take $2,500; he offered me that. I told him I would take $2,560; he said no, he had concluded not to take the lot; that he was figuring with another man to get a number of lots and build together; so he said he was off on the lot, and did not want it at all; I urged him hard to take it, and he would not. The matter stood that way for

some weeks, and then he said to me he would take the lot at $2,500; so then I made the trade with him. This is the history of the transaction with Loomis about the sale of the lots, and either of them.

"When Loomis first came to speak about the lots, he remarked something of the kind, that I must not interfere with his sale. I don't think I had a conversation with Loomis about one lot, except the conversation at the corner of Eleventh and O streets, when he called me.

"I was present at the trial of this cause in the county court. Mr. Loomis said then that at the corner of O and Eleventh streets, he called me, and asked me if I would not sell the lots single, and what price; that I told him $2,700, which he said was too much, and I said I must have $2,600 net to me; that I made that provision, net to me. Then, that he said he could not do work without commission, and then went back into his office. My recollection is that he said that. Then he did nothing more in reference to selling that lot; had no more conversation with A. B. Smith.

"Mr. Loomis, at another time, possibly a week or few days after this sale, called to me and said, you have sold that corner lot; I said yes. He said if it was not sold he could sell the two together, at such and such a price. I think he said J. R. Webster wanted them; that he would take them together at $5,000 or $5,500; would take them together. He said, could you not get them back from Smith? I said possibly I could; he said he would work with Mr. Webster. We could make the sale of the lots to one man this time. Mr. Andrus has made a claim for his services in showing this lot. Mr. McMurtry testified as to some conversation he had with me about these lots and about Loomis telling me to hold on or not do something with his customer at that time. I must say Mr. McMurtry is mistaken about that, I had no —" (question by McMurtry.) "Did you say that you did not come into

the office with Keyser and tell me that if Loomis did not sell you would?" (Witness) "I don't remember anything of that." On cross-examination he testified: "When I bought I had no guaranty that the lots would bring me ten per cent on the investment. Before I got the deed from Beecher, Mr. Loomis asked me what I would take for the lots, and I told him; I said so much net I would sell them. Keyser was interested, and was there, Loomis knew the fact. At the corner Loomis asked me what I would take for the lot. I did not know he had negotiated with Mr. Smith about the sale of this separate lot; I think possibly Mr. Loomis stated he had shown Mr. Smith these two lots, and that Mr. Smith would take them at that time.

"My recollection is that Mr. Smith spoke to me about the single lot before Mr. Loomis said anything about it, and Mr. Loomis did ask about the single lot down there on the corner. After that I sold it to Smith. It was more than a short time afterwards. I think we, Mr. Keyser and I, may have stopped in at McMurtry's office on our way to dinner, but it was about the two lots. I remember no such conversation as McMurtry states. At that time Keyser and I had not separated our interests. Possibly a negotiation was in progress with the Smith boys about the purchase of the two lots. I don't recollect saying I would sell them myself if Loomis did not close it up. It is among the possibilities I may have said so, but if you refer to the single lot, I will emphatically say I said no such thing. I don't remember suggesting to Smith I had been to see about it. I did not mention it. I will say, at that time I did not speak of $2,600 as the price for lot 6, block 125, to Smith."

There is considerable testimony tending to corroborate that of both the plaintiff and defendant. It will thus be seen that there is a conflict in the testimony as to whether there was a contract between the plaintiff and defendant, and if so, its terms. All the testimony, however, tends to

show that the plaintiff below did not effect the sale of the lot in question, but only that he procured a purchaser at the price for which it was sold, when the owner of the lot stepped in and effected the sale. The action, therefore, properly is one for damages, and not for commissions on a completed sale. This objection, however, is not raised by either party, and will not be interposed by the court. This fact, however, doubtless had weight with the trial court in finding the amount due to the plaintiff below; that is, that as the plaintiff below had not performed all the labor necessary to complete the sale, he was entitled merely to the value of the services rendered—in other words, to recover upon a *quantum meruit*.

The proof as to the exact value of such services is not very definite, while the evidence is, the commission on the sum of $2,500 would have been $87.50. The court, therefore, seems to have apportioned the value of the services at a ratable proportion of the amount which the plaintiff below would have been entitled to recover had he completed the sale. This, while not admissible under the pleadings, was not objected to, and the objection therefore is waived, as error must affirmatively appear in order to justify the reversal of a judgment. The errors shown in the record are not sufficient for that purpose, and the judgment of the district court is therefore affirmed.

JUDGMENT AFFIRMED.

THE other judges concur.